IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 12, 2002 Session

## TAYLOR AND FLEISHMAN d/b/a THE TAYLOR LAW FIRM, ET AL. v. KENNETH SEATON

**Appeal from the Chancery Court for Knox County**
**No. 147260-3      Sharon Bell, Chancellor**

**FILED FEBRUARY 3, 2003**

**No. E2002-00075-COA-R3-CV**

---

This is a suit to recover a contractual attorney fee. By virtue of circumstances plaintiff Dudley Taylor had the exclusive standing to contest a petition for the involuntary bankruptcy of Taylor and Associates, LLP, from whom defendant and five other individuals had received preferential payments which were required to be returned to the Trustee if the bankruptcy was approved. Conversely, if the bankruptcy was not approved, the defendant and others similarly situated would retain the preferential payments. The plaintiffs had invested a substantial sum with Taylor and Associates, LLP, but had received no preferences. Dudley Taylor devised a plan whereby, for a fee, he would intervene in the bankruptcy and oppose it, and if he were successful the defendant would retain the preferential payments. The *defendant* proposed a contract by which the plaintiff, for a non-refundable up-front fee of $100,000.00, and a $200,000.00 additional fee contingent upon success, agreed to oppose the bankruptcy as a *party litigant*. He was successful, but the defendant refused to pay the fee, asserting the invalidity of the contract on various grounds, including ethical considerations. The Chancellor allowed a recovery. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL FRANKS, J., joined.

Linda J. Hamilton Mowles, Knoxville, Tennessee, for the appellant, Kenneth M. Seaton.

Dudley W. Taylor, Knoxville, Tennessee, for the appellees, Taylor & Fleishman d/b/a/ The Taylor Law Firm and Dudley W. Taylor.

**OPINION**

The predicate of this action is a written contract between attorney and client. The dispositive issue is whether the contract is valid and thus enforceable. This is the contract:

# KMS
ENTERPRISES, Inc.

**CONTRACT**

This Contract is made and entered into by and between Kenneth M. Seaton, 3124 Tammy King Road, Pigeon Forge, Tennessee 37863, together with those operating entities of which Kenneth M. Seaton owns or effects operating control and/or other participants with Kenneth M. Seaton, collectively the "Client" whereby the Client employs The Taylor Law Firm, 1400 Riverview Tower, 900 South Gay Street, Knoxville, Tennessee 37902, collectively "Attorney," as his Attorney and the Attorney agrees to represent the Client as the Client's interest is for the sole purpose of opposing the involuntary bankruptcy petition filed against a proported entity by name of Taylor & Associates, L. P., Debtor, Dudley W. Taylor, Appellant vs. James S. Bush, et al., Appellees, United States District Court, Eastern District of Tennessee at Chattanooga, Case No. 95-33024, Case No 3:96-CV 539, remanded, ("TALP Bankruptcy"), or an entity related to the TALP Bankruptcy in accordance with following:

1.    Legal Services to be Provided.  The Attorney will provide all legal services necessary to represent the Client's interest including the preparation of pleadings, letters, investigation, research, court appearances, and preparation of other documents, if applicable, in accomplishing the hereinabove stated purpose.

2.    Legal Fees.  Client agrees to pay the Attorney $100,000 (said sum to non-refundable [sic]) on or before April 16, 1997, and to further pay Attorney the additional sum of $200,000 if and in the event the Attorney is successful in opposing the involuntary bankruptcy petition, i.e., a final order is entered dismissing the TALP Bankruptcy.

3.  Authority. Attorney specifically understands and agrees that the Attorney shall not compromise, offer concessions, agree to settlement and/or in any other way settle the herein matter without the prior written consent of the Client.

4.  Confidentiality.   Parties hereto agree to keep the terms and conditions hereof strictly confidential and that neither of them shall reveal same to a third party.

Client                                    Attorney
[Signature]                               [Signature]
Kenneth M. Seaton                         Lori Fleishman, Atty for The Taylor Law Firm

    Date:  4-11-97                      Date: 4-11-97

## I.

A pithy version of the factual scenario will demonstrate its uniqueness. Joe Taylor, d/b/a Taylor and Associates LLP, operated a multi-million dollar ponzi scheme for a remarkably long time. When the scheme collapsed, Joe Taylor killed himself. An involuntary bankruptcy petition was filed alleging that Taylor and Associates, LLP, was a limited partnership, and that Dudley Taylor was a limited partner. Creditors have no standing to contest an involuntary petition, but partners have the requisite standing; consequently, Dudley Taylor had prima facie standing to contest the petition, *if he chose to do so*. Since he had received no preferential payments, a successful contest would avail him nothing; thereupon, the plan hereafter described was devised.

If the bankruptcy proceeded to conclusion, many investors who received preferences, including the defendant, would lose millions of dollars (in addition to the loss or partial loss of their investment) due to the requirement that preferences and profits must be returned to the Trustee.

Many investors, who received no preferences, wanted the bankruptcy to proceed so that they might recover a proportion of their investments, The conflicting interests are apparent.[1]

Dudley Taylor and his law partner, Lori Fleishman, had invested $1,800,000.00 with Taylor and Associates, LLP. So far as the record reveals they had received no preferences, but were in peril of losing about one million dollars of their investment.

The defendant, who had already agreed with the Trustee to return about 2.5 million dollars in preferential payments, was solicited by the plaintiffs to enter into a contract whereby Dudley Taylor, as an intervenor, would oppose the bankruptcy for a non-refundable fee of $100,000.00 and a contingent fee of $200,000.00 if the bankruptcy was successfully opposed. He was actually being paid as a *litigant*, not as an attorney. Stated differently, he bargained *his standing to sue* using his attorney status in the process. If he prevailed, the investors who had received preferential payments would retain such funds, to the detriment of the investors who had not received preferential treatment. The record does not reveal the number of investors who received preferential payments, nor the number of investors who did not recover such payments, but we deduce there were hundreds of the latter.

To those investors who did not receive preferential payments, Dudley Taylor's efforts were detrimental since the preferential payments were not repaid and thus were unavailable for distribution.

The issue of the bankruptability of Taylor and Associates LLP was exhaustively litigated. The final judgment ordered that Taylor and Associates LLP was not entitled to the protection of the

---

[1] Repayment of preferences and profits amounting to millions of dollars would add greatly to the ultimate distributive fund in the probate court.

bankruptcy laws, and the petition was dismissed. Dudley Taylor prevailed.[2] In addition to the contract with the defendant, the plaintiffs solicited five other preferred investors, similarly situated, for varying fees in the event the bankruptcy petition was dismissed. In a word, *the plaintiff would recoup in fees the amount he stood to lose as a result of the bankruptcy.*

## II.

And now for the longer version, and the findings of the Chancellor.

Plaintiffs and defendant had a long-standing attorney-client relationship, spanning about twenty years. It is significant that before the contract at issue was solicited, negotiated and signed, plaintiffs filed suit against defendant in the Circuit Court for Knox County, Tennessee, over a fee conflict with respect to a retainer paid for the 1995 through 1996 period. This suit remains pendent.

The complaint seeks recovery from the defendant Seaton pursuant to a contract dated April 11, 1997. At the time the contract was negotiated and executed, there was pending in the Bankruptcy Court for the Eastern District of Tennessee, a bankruptcy proceeding dealing with a ponzi scheme conceived and operated by Joseph C. Taylor, deceased. It was alleged in the involuntary bankruptcy petition that Taylor and Associates, LLP, (the entity by which Joe Taylor operated the ponzi scheme) was a limited partnership, a legal entity separate and apart from Joe Taylor.

Parenthetically, we note that when an involuntary bankruptcy petition is filed, creditors have no standing to contest the petition, but that partners of the debtor do have standing. Because the petition alleged that Dudley Taylor, individually, was a partner in Taylor and Associates, LLP, he was the only individual who had standing to contest the involuntary bankruptcy petition.

If the bankruptcy proceeded, the Bankruptcy Trustee would be entitled to recover the funds that had been paid out as preferences and profits before Joe Taylor's death. The money repaid by those investors would be used by the Trustee to pay the claims of creditors. Such investors would thereby sustain losses, the amount of which would be determined by the amount of the dividend that would have been paid by the bankruptcy estate upon its closure. Conversely, if the bankruptcy was successfully opposed and the case dismissed, the funds that had been considered a preference and repaid into the estate by investors would be returned to or retained by those investors since there would be no legitimate bankruptcy claim by any creditors to those funds. As stated, the plaintiff

---

[2] The Bankruptcy Court allowed the petition. On appeal to the District Court, the Bankruptcy Court was reversed. The petitioners appealed to the Sixth Circuit, which affirmed. Upon remand for an evidentiary hearing, the Bankruptcy Court ruled that there was no evidence that a partnership existed which was susceptible to bankruptcy. This ruling was appealed to the District Court, which affirmed. The Sixth Circuit affirmed, which concluded the issue. Thus it was that the plaintiff's initial position that he was a limited partner which vested him with legal standing to contest the bankruptcy, underwent a metamorphosis upon remand when he convinced the Bankruptcy Court that no partnership existed.

Dudley Taylor was in the unique position of being the only person who could procedurally oppose the bankruptcy without risk.[3]

He and his partner Lori Fleishman were investors with Joe Taylor and they collectively had personal claims against the bankruptcy estate that had been tentatively approved by the Bankruptcy Trustee in excess of $1,800,000.00. If the Bankruptcy Court allowed the involuntary petition to proceed, Fleishman and Taylor were advised by the Trustee that they would receive only a portion of their total investment, the expected distribution being in the range of $800,000.00 to $1,000,000.00. This was a "best case" scenario for plaintiffs, because a successful opposition to the involuntary bankruptcy petition meant that plaintiffs would receive no distribution from the Bankruptcy Trustee and their investment would be lost.

Defendant Seaton also had invested substantial funds with Joe Taylor, but his position in the Bankruptcy Case was the inverse to that of the plaintiffs. If the involuntary bankruptcy petition was sustained, not only would the defendant lose his investment, but he would be required to repay the preferences and profits obtained from Joe Taylor before his death. According to the Bankruptcy Trustee the defendant had certain liabilities to the bankruptcy estate based on preferences and profits, as a result of which the defendant agreed to pay to the Trustee the amount of $2,460,867.00 in settlement of all transactions involving Joe Taylor. This payment was secured by property pledged as collateral if the bankruptcy was ultimately adjudicated. If, however, the bankruptcy was successfully opposed, there would be no claim for preferences and profits and the defendant would not be required to pay anything to the Trustee.

The plaintiffs contacted defendant by letter dated April 2, 1997, and asked him to pay a portion of their fees in opposing the involuntary bankruptcy petition. The plaintiff Dudley Taylor had intervened in the bankruptcy case, and was a named party; he was not representing the defendant in the bankruptcy matter; he was representing himself and his law partner.

The plaintiffs also sent an identical letter to five other client groups asking them to participate in the payment of a contingent fee. Because opposition to the bankruptcy petition would be detrimental to plaintiffs, they expected to receive the same amount of distribution in the form of attorneys fees as they would have received from the Bankruptcy Trustee if there was no opposition to the petition: $800,000.00 to $1,000.000.00. Solicitation was thereupon made of these client groups and arrangements were made for fee apportionment based, not on time or effort of counsel, but on the *percentage exposure* each of the investor groups had in the bankruptcy. The fee arrangement proposed by plaintiff was to charge one-half his usual hourly rate with that rate and the expenses allocated among defendant and the other five client groups based on the tentative understanding as to each one's preferences and profits exposure.

_____

[3] Any creditor or debtor might oppose in an adversarial proceeding but at substantial risk. Dudley Taylor was positioned so that he could oppose at no significant risk, nor, as it were, for no significant benefit, as a *litigant.*

In response to this solicitation, *defendant proposed* a contract unique to him; specifically that he pay $100,000.00 immediately, with a $200,000.00 contingent fee payable upon successful opposition to the bankruptcy case. If the bankruptcy proceeded, there would be no contingent fee due to the plaintiffs. The defendant insisted that the definition of "Client" should include himself, "together with those operating entities of which Kenneth M. Seaton owns or effects operating control *and/or other participants* with Kenneth M. Seaton, collectively the "Client". Defendant's reason for including "and/or other participants" was that he intended to have other individuals assist in paying the fees identified in the document as the funding of the opposition to the bankruptcy. In fact, defendant had several individuals who had already agreed to participate in the funding prior to the contract in question being signed by the plaintiff. Plaintiffs agreed to this provision and the Contract was prepared by the defendant's general counsel.[4]

After the contract was executed and defendant had paid the initial $100,000.00 to plaintiffs, they objected to defendant obtaining funds from other investors to assist in financing the fee obligation under the contract. Plaintiffs refused to allow "other participants with Kenneth M. Seaton" to be included as a "Client" under this document because they wanted to contact certain others to participate.

During the course of representation, plaintiffs discussed possible settlement of the bankruptcy with the Trustee by discontinuing plaintiffs' opposition to the bankruptcy petition if certain individuals were not pursued for preference repayment by the Trustee. This possible settlement was not discussed with the defendant, and it was the plaintiffs' position that the matter would be settled with or without defendant's participation. The defendant argues that this position of the plaintiffs was in direct contradiction to the contract at issue which provides that the attorney will not "compromise, offer concessions, agree to settlement and/or in any other way settle the herein matter without the prior written consent of the Client." The contract, it should be seen, does not prohibit *attempts or overtures* to settlement.

Plaintiff threatened to make the best deal that he could for the five client groups that plaintiffs were representing simultaneously with the defendant, whether or not the defendant was included in that settlement and whether or not the settlement would have harmed the defendant's position.

Plaintiff testified that at the time he was doing the work in opposing the bankruptcy petition, his billing rate was $200 per hour. Ms. Fleishman's billable rate at the time was $140 per hour and attorney David Jones, an associate of plaintiff Taylor, billed at a rate of $150 per hour. Plaintiff Taylor further testified that paralegals in his office billed for their work at a rate of between $30 and $50 per hour. From March 31, 1997 through June 2000, plaintiff The Taylor Law Firm registered 1,571 hours of attorney time and 202 hours of paralegal time working on the opposition to the bankruptcy petition.

---

[4] The defendant employed a number of attorneys, including a general counsel.

The amount paid to plaintiffs for work on the bankruptcy opposition, *excluding* any fees from the defendant, totaled $675,000. This amount was based on the approximate exposure of the other five client groups of $4,500,000.00. Defendant, however, had already paid a non-refundable, non-contingent $100,000.00 to the plaintiffs for *representation in opposition to the bankruptcy petition* at the time the contract was signed. Thus the amount received by plaintiffs was $775,000, without the contingent $200,000.00 at issue in this appeal.

Pursuant to a motion filed by the plaintiffs, the Chancellor granted partial summary judgment that the contract was enforceable but reserved two issues for trial: 1) defenses to plaintiff's claim based upon, and the meaning of, paragraph 3 of the contract and its application to the settlement discussions between attorney Taylor and the Bankruptcy Trustee; and 2) the effect of DR 2-106 on the enforceability of the contract or the amount to be awarded, if any, as to plaintiffs' claims. The issues of prejudgment interest and the right to punitive damages were not subject to the motion for partial summary judgment and were reserved for determination at trial. All other of defendant's defenses were found in favor of the plaintiffs.

At the non-jury trial, the only issues, in a technical sense, that were litigated were those remaining after partial summary judgment was entered.[5] The Chancellor found that the contract dated April 11, 1997, was valid and enforceable and that plaintiffs were entitled to recover $200,000.00 from the defendant. The Chancellor also found that plaintiffs' quantum meruit claim should be dismissed.[6] Interestingly, Chancellor Bell specifically held that she was not sitting as a Board of Professional Responsibility and would not rule on the ethical considerations raised by the defendant in this case, but thereafter added a postscript to her findings that if she were to decide on the ethics of the situation, she would find no ethical violations based on the instant record.

The plaintiffs moved to alter or amend the judgment to seek pre-judgment interest. The defendant objected on the basis that this was argued and sought in the underlying trial and had been denied. The Chancellor had specifically found that the claim for fees in this specific instance was not a liquidated claim, that there were reasonable defenses applicable and that sophisticated parties could have provided for interest in the contract if they had so intended.

Defendant argued that a Tennessee Rules of Civil Procedure Rule 59.04 motion to alter or amend was inappropriate merely to relitigate or reargue something which had already been adjudicated, and that the motion did not satisfy the criteria for a motion to alter or amend a judgment.

The Chancellor granted plaintiffs' motion to alter and awarded pre-judgment interest from April 24, 2000, the date of the last judgment issued by the Sixth Circuit Court of Appeals regarding the Joe Taylor bankruptcy matter.

---

[5] The plaintiffs observe that for all practical purposes the case was tried as though summary judgment had not been granted.

[6] When the defendant questioned the amount of the fee, the plaintiffs "retaliated" by amending their complaint to seek payment for services on a quantum meruit basis as allowed by DR 2-106.

## III.

The issues, as propounded by the defendant, are:

1.     Whether the Chancellor erred in granting partial summary judgment on the enforceability of the contract at issue under the facts and circumstances in this case;

2.     What is the interconnection between the rules of conduct and validity of written contracts in the legal profession?  Specifically, did the Chancellor err in holding that the contract was valid and binding upon the parties under the facts and circumstances in this case:

> •       Where there was a clear conflict of interest between the interests of counsel and those of the client with respect to the subject matter of the employment contract;

> •       Where the interests of other clients of counsel were in direct conflict with the terms of representation of the client under the employment contract at issue on the subject of identical representation;

> •       Where counsel solicited the employment of the client notwithstanding existing litigation between counsel and client over legal fees in related litigation;

> •       Where counsel was attorney, witness and interested party in the matter for which representation was requested;

> •       Where the fees for the representation by counsel bore no relationship to the work performed but were based solely on the amount of money counsel would have obtained from sources outside the representation of these clients; and

3.     Whether the Chancellor erred in modifying and altering the final judgment so as to award prejudgment interest.

As propounded by the plaintiffs, the issues are:

4.     Whether the plaintiffs are entitled to recover fees greater than the contracted amount;

5.      Whether the defendant's actions were fraudulent; and

6.      Whether the plaintiffs are entitled to punitive damages.

## IV.

The standard of review is *de novo* on the record with a presumption that the factual findings are correct. Rule 13(d), Tenn. R. App. P.; ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87 (Tenn. 1993). Conclusions of law are accorded no presumption of correctness. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26 (Tenn. 1996).

The grant of partial summary judgment is subject to review in this appeal. In ***Guiliano v. Cleo, Inc.***, 995 S.W.2d 88, 94 (Tenn. 1999), the Supreme Court set out the standard of appellate review of a trial court's grant of summary judgment as follows:

> The standards governing an appellate court's review of a motion for summary judgment are well settled. Summary judgment is appropriate only where the moving party demonstrates that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. ***Byrd v. Hall***, 847 S.W.2d 208, 210 (Tenn. 1993); Tenn. R. Civ. P. 56.03. We review the summary judgment motion as a question of law in which our inquiry is *de novo* without a presumption of correctness. ***Finister v. Humboldt Gen. Hosp., Inc.***, 970 S.W.2d 435, 437 (Tenn. 1998); ***Robinson v. Omer***, 952 S.W.2d 423, 426 (Tenn. 1997). We must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. ***Byrd***, 847 S.W.2d at 210-11. If both the facts and conclusions to be drawn therefrom permit a reasonable person to reach only one conclusion, then summary judgment is appropriate. ***Robinson***, 952 S.W.2d at 426; ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997).

The propriety of the granting of plaintiffs' motion to alter or amend the judgment pursuant to Tennessee Rules of Civil Procedure 59.04 is subject to an abuse of discretion review. *See,* ***Spencer v. A-1 Crane Service Inc.***, 880 S.W.2d 938 (Tenn. 1994).

## V.

As we have stated, the contract is the predicate of this suit, and its validity is dispositive. The defendant argues that its validity cannot be determined, prima facie, as a matter of law because "there were many factual issues raised by the defendant" which were not considered at the trial because of the grant of summary judgment. One of the asserted factual issues is said to be the proper interpretation of the word "client" in the contract, which defined "client" as the defendant and those operating entities which he owned or controlled, "and/or other participants with defendant."

The plaintiffs interpreted the contract definition of "client" to mean only the defendant and the companies he owned or controlled. The defendant argued that the plaintiff could not ignore the phrase "and/or other participants with defendant."

Since the plaintiffs purposed to solicit "other participants," they[7] objected to the defendant doing the same thing. In the latter event, the plaintiffs possibly would find themselves with unwanted clients.

We see no ambiguity in this simple contract. Its terms and conditions are clear, and its meaning is manifest. This being so, it is axiomatic that the interpretation of the contract is a question of law. We do not believe that the disagreement of the parties concerning the definition of "client" is a material fact, thereby negating summary judgment.

The other fact which the defendant alleges was disputed and thus beyond the range of summary judgment is that he was induced into the execution of the contract because he was concerned that Dudley Taylor would not oppose the bankruptcy, in which event he - the defendant - would have no opportunity to attempt the retention of 2.5 million dollars in preferences. He testified that the plaintiffs told him they would not oppose the bankruptcy unless he agreed to pay a portion of their fees, because they already had invested substantial time and expense, and that they would fare better if the bankruptcy proceeded. The defendant argues that he was thus threateningly induced "to sign the contract."

This argument is perplexing. There is no doubt whatever that the defendant was fully informed of the 'plan' devised by The Taylor Law Firm, and that he agreed to it. He was aware of the unusual nature of the undertaking - that Dudley Taylor was uniquely situated to challenge, without undue risk, the petition for involuntary bankruptcy, and that he was "selling" his prerogative to selected and willing "clients." The contract, reduced to its essentials, is not one for employment in the traditional sense; *Taylor was the litigant*, and represented himself. The defendant and other "clients" were not litigants; they merely paid Taylor to continue the litigation because they, and not him, (except for the fees paid) would profit if the challenge was successful.

The defendant does not particularize any disputed material fact other than the two discussed above, neither of which created a genuine issue of a disputed material fact. Rule 56, Tenn. R. Civ. P.

In order to enforce a contract with a client, an attorney must demonstrate: 1) that he provided the client with the same information and advice that the attorney would have provided the client had he not been personally interested in the transaction; 2) that the client fully understood the meaning and effect of the contract; 3) that the client's understanding of the contract was the same as the

---

[7] The contract was executed by Lori Fleishman, a partner in The Taylor Law Firm. Its terms were determined by the defendant and his general counsel. Dudley Taylor testified that he had no input, but merely agreed to the terms and provisions of the document.

attorney's; and 4) that the contract is just and reasonable. *Alexander v. Inman*, 903 S.W.2d 686, 694 (Tenn. Ct. App. 1995).

This record clearly reveals that (1) Taylor provided the defendant, and the other five financiers or participants, with the same information and advice that he would have provided had he been completely detached; (2) the defendant fully understood the meaning and effect of the contract, keeping in mind that the *defendant dictated the terms* of the contract which was prepared by another of his attorneys; (3) the defendant certainly understood his own handiwork; (4) the contract is just and reasonable.

## VI.

The defendant questions whether the contract is valid when reviewed against ethical standards. This issue was raised in the trial court, which initially ruled that she was not sitting as a Board of Professional Responsibility; later, upon further reflection, she ruled that, even so, she found no evidence of unethical conduct.

The defendant argues that a contract of employment between attorney and client which violates the ethical mandates governing the profession must be considered void ab initio. We fully agree.

The ethical mandates that the plaintiff is alleged to have violated are EC 5-1 of the Code of Professional Responsibility which requires a lawyer to exercise his professional judgment solely for the benefit of the client. The defendant argues that the plaintiff would benefit if the bankruptcy proceeded, while the defendant's interest would benefit if the bankruptcy was dismissed, hence a clear conflict of interest. We disagree. The plaintiff would gain nothing if his efforts were unsuccessful, the up-front fee aside. The bankruptcy would proceed, and the preferences would be returned to the Trustee. The defendant says that the threat of severe financial loss [i.e., the repayment of 2.5 million in preferences] induced him to sign the contract,[8] and that "his presence was necessary to insure that the fees obtained by the plaintiff approximated what they would have received had the bankruptcy been approved." This is true; in fact, it was the sole reason for the contract.

Attorneys have a fiduciary relationship with their clients and, therefore, must deal with them with the utmost good faith. *Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn. 1983). The fiduciary relationship arises when a client first consults an attorney and extends to all dealings between the attorney and the client, including the process by which the attorney and the client reach an agreement concerning the terms of employment. *Cummings v. Patterson*, 442 S.W.2d 640 (Tenn. Ct. App. 1968). Attorneys must not permit their own private interests to conflict with those of their clients.

---

[8] The terms and condition of which *he dictated*, and which was prepared by *his* general counsel.

Many of the duties imposed upon lawyers by the Tennessee Code of Professional Responsibility represent a clear and definitive statement of public policy. The Supreme Court has expressly recognized that specific "provisions of the Code of Professional Responsibility, promulgated by the Supreme Court and authorized by the Tennessee Constitution and statutes, reflect public policy . . . ." *Swafford v. Harris*, 967 S.W.2d 319, 322 (Tenn. 1998) (addressing Disciplinary Rule 7-109(C)); *see also Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 531 (Tenn. 1991) (addressing Canon 2 and Disciplinary Rule 2-108).

The defendant argues that the plaintiffs' actions implicated the Disciplinary Rules of the Code of Professional Responsibility, particularly DR 5-105 and DR 5 106 which (DR 5-105) require a lawyer to decline employment if the interests of another client might impair his professional judgment, and (DR 5-106) which requires the consent of all clients with similar claims to a proposed settlement. We are somewhat perplexed by the defendant's argument that the plaintiffs' settlement approach to the Trustee[9] was unethical because it violated the contract. There is no evidence that the plaintiffs violated the contract.

Perhaps the most significant argument of the defendant is directed to the fact that the plaintiffs solicited the defendant for employment notwithstanding there was pending litigation between them over legal fees for prior representation.

It is undisputed that there was pending litigation between the plaintiffs and the defendant over prior representation and the payment of attorney fees. Plaintiffs filed suit against defendant in the Circuit Court for Knox County before the contract at issue was executed. The prior suit was still pending at the time of plaintiffs' solicitation for the contract currently at issue, and remains pendant. The defendant argues that the existence of pending litigation between counsel and client, at a time when further representation is being solicited, is clearly a conflict of interest which should invalidate the representation solicited and the contract should be rendered void. We cannot agree. The defendant clearly waived any disqualification presented by the prior litigation.

The defendant next argues that the fees for the representation by counsel bore no relationship to the work actually performed but the fees were based solely on duplicating the amount of money counsel would have obtained from the bankruptcy estate if plaintiffs had not opposed the involuntary bankruptcy petition.

---

[9] After the plaintiff embarked upon his mission to oppose the bankruptcy, he encountered various obstacles and became frustrated on occasion which led to his approach to the Trustee to attempt settlement based on his withdrawal of opposition to the bankruptcy if his clients could retain their preferences. Needless to say, this approach was unsuccessful. The contract provides that "the attorney shall not compromise, offer concessions, agree to settlement and/or in any other way settle the herein matter without the prior written consent of the client." The defendant argues that the plaintiff violated this provision. We disagree. He settled nothing, just merely attempted to, which the contract does not prohibit.

<u>DR 2-106 Fees for Legal Services.</u>

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the service.
(8) Whether the fee is fixed or contingent.

The "fees" were crafted to equal the approximate amount as the distribution they would receive from the Trustee if the bankruptcy opposition was unsuccessful. The defendant argues that he was charged an exorbitant fee which bore no relationship to the hours expended by counsel, for work that was being done on others' behalf also and for which numerous investors received the ultimate benefit without cost.

To this argument the plaintiffs respond that defendant himself set the fees in this contract. But we must observe that the compensation received by the plaintiff was not a "fee" in the traditional sense. *He was not, we repeat, representing the defendant, he was representing himself: he sold, as it were, his cause of action.* DR 2-106 does not apply here, but, even so, we find that the evidence does not preponderate against the Chancellor's findings.

Moreover, we note that several distinguished lawyers testified that the "fees" of the plaintiffs were reasonable when measured against the factors prescribed by DR 2-106. The defendant offered little countervailing evidence directed to this issue other than a mathematical calculation that, based on the plaintiffs' time-records, their fees extrapolated to nearly $700.00 per hour which is about three times the ordinary or generally accepted hourly rate for Knoxville lawyers. Excessive fees are

anathema to the profession and our examination of this issue is more than a cursory one. But even if the facts could be construed to support the theorem of the defendant, we remain unable to find that the evidence preponderates against the findings of the Chancellor.

The Chancellor allowed interest at a reduced rate on the recovery. This action was well within her discretion and we find no abuse of it. *See,* ***Myint v. Allstate Ins. Co.,*** 970 S.W.2d 920 (Tenn. 1998). We have considered the remaining issues and find that the evidence does not preponderate against the findings of the Chancellor.

Owing to the nature of the case we have subjected it to careful scrutiny. There is no evidence or indication of fraud or overreaching or of a breach of confidentiality. The defendant was fully informed, and raised no question or complaint about the contract during the years of its pendency. He refused to pay the contingent portion of the fee on grounds known to him for years, but it was not until after the plaintiff, by his efforts alone, saved the defendant 2.5 million dollars that the defendant refused to pay the contractual fee. We conclude that to allow the defendant to be thus enriched would be egregious.

The judgment is affirmed at the costs of the appellant.

_____
WILLIAM H. INMAN, SENIOR JUDGE